# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **WAYNE A. PAGE,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:20cv00012 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of** | ) | By:  PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## *I.  Background and Standard of Review*

Plaintiff, Wayne A. Page, ("Page"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

(4th Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Page protectively filed his application for DIB[2] on August 7, 2017, alleging disability as of July 22, 2017,[3] based on neck, back and joint pain; neuropathy; anxiety; depression; panic attacks; and learning problems. (Record, ("R."), at 18, 209-10, 228, 249-50.) The claim was denied initially and upon reconsideration. (R. at 129-31, 135-37, 140-43, 145-47.) Page then requested a hearing before an administrative law judge, ("ALJ"). (R. at 148-49.) The ALJ held a hearing on June 3, 2019, at which Page was represented by counsel. (R. at

---

[2] On April 4, 2014, Page filed an application for DIB, alleging disability as of February 10, 2013. (R. at 67.) By decision dated July 21, 2017, the ALJ denied Page's claim. (R. at 67-80.) There is no indication that Page appealed this decision.

In accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same...title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999). Those standards have been superseded by 20 C.F.R. § 404.1520c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous 2017 decision and found it to be "somewhat persuasive." (R. at 35.) The ALJ noted the evidence did not show a major change in Page's overall course of treatment since the 2017 decision. (R. at 35.) Based on Page's normal pulmonary findings noted throughout the record, combined with the lack of treatment for respiratory complaints, the ALJ omitted several of the environmental limitations identified in the 2017 decision. (R. at 35.) Based on new and material evidence, the ALJ in this case found Page suffered from severe mental impairments; therefore, he placed mental limitations on Page's work-related ability. (R. at 35.)

[3] On his application for DIB, Page alleged an onset of disability date of July 19, 2017. (R. at 209.) Because his prior DIB application was denied by decision dated July 21, 2017, Page's alleged onset date of disability is July 22, 2017, the day following the prior ALJ's decision.

47-63.)

By decision dated July 17, 2019, the ALJ denied Page's claim. (R. at 18-38.) The ALJ found Page met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 20.) The ALJ found Page had not engaged in substantial gainful activity during the period from his alleged onset date of July 22, 2017, through his date last insured of December 31, 2018.[4] (R. at 20.) The ALJ determined that, through the date last insured, Page had severe impairments, namely arthritis; neck and back pain; obesity; major depressive disorder; generalized anxiety disorder; and borderline intellectual functioning, but he found Page did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-21.)

The ALJ found that, through the date last insured, Page had the residual functional capacity to perform light[5] work, except he could occasionally perform postural activities, but could not climb ladders, ropes or scaffolds; he should avoid concentrated exposure to temperature extremes, vibrations and industrial hazards; he could understand, remember and carry out simple instructions and perform simple tasks with occasional interaction with others; and he would be off task less than 10 percent of the workday. (R. at 26.) The ALJ found that, through the date last insured, Page was unable to perform any past relevant work. (R. at 36.) Based on Page's age, education, work history and residual functional capacity and the

---

[4] Therefore, Page must show he was disabled between July 22, 2017, the alleged onset date, and December 31, 2018, the date last insured, to be eligible for benefits.

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Page could perform, including the jobs of a marker, a router and a clothing bagger. (R. at 37, 59.) Thus, the ALJ concluded that, through the date last insured, Page was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 38.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Page pursued his administrative appeals, (R. at 299-301), but the Appeals Council denied his request for review. (R. at 1-5.) Page then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Page's motion for summary judgment filed December 21, 2020, and the Commissioner's motion for summary judgment filed January 12, 2021.

## II. Facts

Page was born in 1971, (R. at 50, 209), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a seventh-grade education[6] and past work experience as a mine machinery mechanic. (R. at 50, 58.) Page stated he could read and write "some." (R. at 50.) He stated he could read part of a newspaper, but he did not know the meaning of a lot of the words. (R. at 51.)

In rendering his decision, the ALJ reviewed medical records from Dr. Sreeja Kadakkal, M.D., a state agency physician; Dr. R.S. Kadian, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Richard Surrusco,

---

[6] Page indicated on his Disability Report that he completed the eighth grade. (R. at 229.)

M.D., a state agency physician; Haysi Clinic; Dr. Shaun Hines, D.O.; Paige Billman, Psy.D., a licensed clinical psychologist; and William A. Davis Clinic.

Page sustained a work-related neck injury in 2005 and was reportedly out of work for six months after the injury, but returned to work in a less strenuous capacity before being laid off in 2013. (R. at 205, 432.) In 2014, pulmonary function testing showed Page's forced vital capacity, ("FVC"),[7] was at 70 percent of the predicted FVC; and his forced expiration volume one second, ("FEV$_1$"),[8] was at 70 percent of the predicted FEV$_1$. (R. at 304-10.) X-rays of Page's lungs showed small opacities compatible with pneumoconiosis. (R. at 308-09.)

From January 2017 through March 2019, Malena Mullins, N.P.-C., a certified nurse practitioner with the Haysi Clinic, treated Page for his complaints of neck, back and joint pain and hypertension. Page routinely reported depression, difficulty sleeping due to pain and irritability due to lack of sleep and pain, but he denied difficulty focusing. (R. at 410, 422, 428, 440, 446, 492, 664, 671, 678, 715, 737, 746.) Mullins diagnosed pain in unspecified elbow; palindromic rheumatism;[9] pain in unspecified joint; lumbago with sciatica, right side; low back pain; generalized anxiety disorder; and shortness of breath.[10] (R. at 411, 423, 429, 441,

---

[7] FVC refers to forced vital capacity, or the total volume of air a patient is able to exhale for the total duration of the test during maximal effort. *See* aafp.org/afp/2014/0301/p359.html (last visited Mar. 11, 2022).

[8] FEV$_1$ refers to forced expiratory volume in one second, or the total volume of air a patient can exhale in the first second during maximal effort. *See* aafp.org/afp/2014/0301/p359.html (last visited Mar. 11, 2022).

[9] Palindromic rheumatism is a rare condition where symptoms like those of rheumatoid arthritis – joint inflammation, pain and swelling – come on suddenly and then disappear just as quickly. *See* https://www.arthritis.org/diseases/palindromic-rheumatism (last visited Mar. 11, 2022).

[10] Mullins noted Page's lumbago with sciatica, right side; low back pain; and shortness of

447, 493.) During this time, Page reported he was doing better with pain management, as Percocet and Toradol controlled his pain, and he planned to include Tylenol to his medication regimen.[11] (R. at 413, 426, 438, 490, 661, 676, 713.) Throughout this time, Mullins consistently found Page's breathing was effortless and normal; auscultation of his lungs revealed clear breath sounds, bilaterally; his breath sounds were normal in volume; he had appropriate judgment and good insight; he was fully oriented; his recent and remote memory were intact; and he had a euthymic mood and appropriate affect.[12] (R. at 411, 422-23, 429, 440, 446, 498, 664, 672, 716, 738, 746.)

On March 7, 2017, Mullins completed a medical assessment, indicating Page could lift and carry items weighing five pounds occasionally and up to seven pounds frequently; he could sit and stand and/or walk up to two hours each in an eight-hour workday, and he could do so for less than 30 minutes without interruption; he could occasionally climb and kneel, but never stoop, balance, crouch or crawl; and he could not work around heights and vibrations. (R. at 416-18.) Mullins opined Page would be absent from work more than two days a month. (R. at 418.) On March 1, 2019, Mullins completed another medical assessment, which adopted her March 7, 2017, assessment. (R. at 731-33.)

On April 24, 2017, Page saw Alysia Hoover-Thompson, Psy.D., a licensed

---

breath were first diagnosed in July and October 2016. (R. at 441, 447, 498.)

[11] Page was prescribed Norco from December 2016 through June 2017, and reported it controlled his pain. (R. at 409-10, 421-22, 427, 445.) He was prescribed Percocet from December 2016 through September 2017 and oxycodone from September 2017 through March 2019. (R. at 410, 422, 428, 439, 445, 491, 497, 670, 714, 736, 744.) He was prescribed Zoloft from June 2018 through March 2019. (R. at 662, 744.) Yet, on March 28, 2019, a urine drug screen was negative for these medications. (R. at 741.)

[12] Mullins did not document any musculoskeletal findings.

clinical psychologist with Haysi Clinic, for his complaints of depression. (R. at 432-36.) Page's mood was depressed with a congruent affect; he made appropriate eye contact; he was fully oriented; he had intact thought process; he exhibited no paranoia, hallucinations or delusions; he denied suicidal and homicidal ideations; and his insight and judgment were good.[13] (R. at 434.) Hoover-Thompson diagnosed generalized anxiety disorder and major depressive disorder, single episode, severe without psychotic features. (R. at 433.) Page saw Hoover-Thompson approximately monthly throughout 2017 and in 2018. (R. at 490-95, 508-12, 516-55, 683-94.) During this time, Page reported increased pain[14] and depression, as well as frustration for having to wait on a decision related to his disability claim. (R. at 526, 541, 546.)

In August 2017, Page saw Hoover-Thompson and reported his pain was managed "a little better" since changing medications. (R. at 541.) In October 2017, Page reported he felt best on the weekends when his grandchildren visited. (R. at 531.) In November 2017, Hoover-Thompson reported Page was fidgety and paced the office due to pain. (R. at 526.) In December 2017, Page complained of difficulty sleeping and reported his depression had increased following the recent death of his mother and the denial of his disability appeal. (R. at 521.)

On December 2, 2017, Dr. Shaun Hines, D.O., examined Page at the request of Disability Determination Services. (R. at 479-85.) Page reported he was

---

[13] At subsequent office visits, Page's examination findings remained unchanged, except in May and June 2017, when his mood was mildly depressed. (R. at 490, 492, 508, 516, 521, 526, 531, 536, 541, 546, 551.)

[14] Despite Page's complaints of increased pain during this time, his primary care provider, Mullins, found he had appropriate judgment and good insight; he was fully oriented; his recent and remote memory were intact; and he had a euthymic mood and appropriate affect. (R. at 492, 664, 672, 678-79, 716, 738, 746.)

disabled based on neck, back and joint pain, neuropathy, anxiety and depression, but stated he was independent with his activities of daily living. (R. at 479.) Page was in no acute distress; his respiratory and cardiovascular examinations were normal; his extremities had no edema, cyanosis or erythema; he was fully oriented; he was cooperative and was able to communicate without deficits; he did not appear depressed or anxious; his recent and remote memory were intact; he had good insight and cognitive function; he had good tone and strength, bilaterally, in all muscle groups, except his bilateral lower extremities had 4/5 strength; he had 5/5 grip strength on the left and 4/5 on the right with adequate fine motor movements, dexterity and ability to grasp, bilaterally; he was able to sit in no significant distress, walk and stand in the office despite reporting his pain scale at 8/10; he had intact sensation; his gait was normal, but he was slow to rise from a sitting position without assistance; he was able to bend with moderate difficulty; he had no muscle asymmetry, atrophy or involuntary movements; his straight leg raising tests were negative; and he had joint tenderness in his neck and back during range of motion, but no signs of joint instability, inflammation or deformity. (R. at 480-82.) Dr. Hines diagnosed chronic neck pain; back pain; carpal tunnel syndrome; hypertension; and depression. (R. at 481.)

Dr. Hines concluded Page would "unlikely" be able to walk and/or stand for a full workday, and he "may be" able to sit for a partial workday with allotted occasional breaks. (R. at 482.) Dr. Hines added that Page would be limited to lifting or carrying items weighing less than 10 pounds, and he should refrain from excessive bending, stooping and crouching. (R. at 482.)

On December 12, 2017, Dr. Sreeja Kadakkal, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), indicating Page had no limitations in his ability to understand, remember or apply

information, to concentrate, persist or maintain pace and to adapt or manage himself. (R. at 94-95.) He opined Page had mild limitations in his ability to interact with others. (R. at 95.) Dr. Kadakkal concluded Page's depressive, bipolar and related disorders were nonsevere. (R. at 94.)

On December 12, 2017, Dr. R.S. Kadian, M.D., a state agency physician, completed a medical assessment, indicating Page had the residual functional capacity to perform light work; push/pull as much as the lift/carry restrictions; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl and never climb ladders, ropes and scaffolds; and he should avoid concentrated exposure to temperature extremes, vibration, fumes, odors, dusts, gases, poor ventilation and work hazards, such as machinery and heights. (R. at 97-98.) No manipulative, visual or communicative limitations were noted. (R. at 98.) To support his findings, Dr. Kadian noted the record indicated Page had osteoarthritis; slightly reduced muscle strength in his bilateral lower extremities and right grip; difficulty rising from a seated position; and difficulty bending. (R. at 98.) On March 23, 2018, Dr. Richard Surrusco, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. Kadian. (R. at 116-18.)

On January 23, 2018, Paige Billman, Psy.D., a licensed clinical psychologist, evaluated Page at the request of Hoover-Thompson. (R. at 557-62.) Page reported, on a typical day, he would sit and play with his grandchildren; he watched television for a couple of hours; and he listened to the radio. (R. at 559-60.) He stated he stayed home most of the time, as he did not like being around people. (R. at 560.) Page reported that, when he was employed, he only worked around one or two people at a time. (R. at 560.) Page's grooming and hygiene were normal; his affect was suggestive of anxiety and depressive symptoms; he was friendly and cooperative; he appeared to be in pain throughout the evaluation based

on frequent shifting and fidgeting in his chair and the need to rise and sit; his eye contact was good; his concentration was adequate; he exhibited no signs of serious memory problems or psychosis; his speech was normal; his thought processes were logical; and his insight and judgment were fair to good. (R. at 557.)

The Kaufman Brief Intelligence Test, Second Edition, ("K-BIT II"), was administered, and Page obtained a verbal IQ score of 62, a nonverbal IQ score of 77 and an overall IQ score of 69, suggestive of borderline intellectual functioning.[15] (R. at 560-61.) Page's performance on the Wide Range Achievement Test, Fourth Edition, ("WRAT-IV"), suggested Page appeared to be functioning at an elementary school level with reading, spelling and math skills. (R. at 561.) The Beck Depression Inventory – Second Edition, ("BDI-II"), and the Burns Anxiety Inventory, ("BAI"), were indicative of severe depressive symptomology and severe anxiety. (R. at 561.) Billman diagnosed major depressive disorder, single episode, severe without psychotic features; generalized anxiety disorder; and borderline intellectual functioning. (R. at 562.)

On March 9, 2018, Billman completed a mental assessment, finding Page had slight limitations in his ability to use judgment in public, to interact with supervisors and to maintain personal appearance; more than slight limitations, but with a retained satisfactory ability, to follow work rules, to relate to co-workers, to deal with the public, to function independently, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability; serious limitations, resulting in an unsatisfactory ability, to deal with work stresses, to maintain attention and concentration and to understand, remember and carry out detailed job

---

[15] Billman noted these scores were to be interpreted with caution due to the significant difference between Page's verbal and nonverbal indices. (R. 560.)

instructions; and a major limitation, resulting in no useful ability, to understand, remember and carry out complex job instructions. (R. at 564-66.) She opined he could manage benefits in his own best interest, but would be absent from work more than two days monthly. (R. at 566.) Billman based these findings on Page's borderline intellectual functioning, poor reading and spelling skills and the results of the K-BIT II and WRAT-IV. (R. at 565.)

On March 23, 2018, Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF, indicating Page had mild limitations in his ability to interact with others; moderate limitations in his ability to understand, remember or apply information and to concentrate, persist or maintain pace; and no limitations in his ability to adapt or manage himself. (R. at 113-14.) Leizer concluded Page's depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; and borderline intellectual functioning were severe. (R. at 113.) Leizer based his findings on Page's diagnoses of moderate depression, anxiety and borderline intellectual functioning. (R. at 114.) Leizer opined Page could perform simple, unskilled work. (R. at 114.)

Leizer also completed a mental assessment, finding Page was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. at 118-20.) Leizer stated Page's work-related mental abilities were, otherwise, not significantly limited. (R. at 119-20.)

On May 22, 2018, Page saw Hoover-Thompson and reported increased pain.

(R. at 683.) He stated that it would be okay with him if he was hit by a truck on his way home, but he denied any plan or intent to take his life. (R. at 683.) Hoover-Thompson reported Page walked very slowly to and from the waiting room, had difficulty rising from a sitting position and shifted often in his chair. (R. at 683.) On June 19, 2018, Page saw Hoover-Thompson and reported increased depression and continued problems with chronic pain. (R. at 689.) He admitted he forgot to speak to Mullins about taking an anti-depressant. (R. at 689.) Page had a depressed and anxious mood and congruent affect; he had nonsuicidal, morbid ideation with no plan or intent to take his life; he exhibited no homicidal ideations, hallucinations, delusions or paranoia; and he had normal insight and judgment. (R. at 689.) Hoover-Thompson again reported Page walked very slowly to and from the waiting room, had difficulty rising from a sitting position and shifted often in his chair. (R. at 689.)

On September 7, 2018, Crystal Burke, L.C.S.W., a licensed clinical social worker with Haysi Clinic, saw Page at his wife's request due to increased depression, agitation and irritable mood. (R. at 707.) Page reported chronic health-related problems, especially chronic pain, difficulty coping with anxiety and difficulty concentrating. (R. at 707.) Page was clean, neat and casual; his mood was depressed with an irritable affect; he made appropriate eye contact; his thought process was scattered; he exhibited no paranoia or delusions; and his judgment and insight were good. (R. at 709.)

On October 31, 2018, Katherine Burner Barnett, L.C.S.W., a licensed clinical social worker with William A. Davis Clinic, saw Page for his complaints of depression and anxiety. (R. at 700.) Page reported his symptoms had worsened since becoming unable to work. (R. at 700.) Page was well-groomed; he had a depressed and anxious mood with congruent affect; he made appropriate eye

contact; his insight and judgment were normal; and he exhibited no hallucinations, delusions or paranoia. (R. at 702.) Barnett also noted Page was fidgety and shifted in his seat due to pain. (R. at 702.) She diagnosed major depressive disorder and generalized anxiety disorder. (R. at 703.)

On January 2, 2019, Page saw Barnett and reported increased worry about his finances. (R. at 696.) He also reported his younger brother, who was very helpful to him, was recently incarcerated. (R. at 696.) Page's examination findings and diagnosis remained unchanged. (R. at 697-98.) On February 20, 2019, Page saw Barnett and reported he was trying to find small projects around the garage to focus on, and he did things with his grandchildren despite being in pain. (R. at 722.) Page's examination findings remained unchanged. (R. at 723.) That same day, Barnett completed a mental assessment, finding Page had slight limitations in his ability to follow work rules, to understand, remember and carry out simple job instructions and to maintain personal appearance; more than slight limitations in his ability to relate to co-workers, to use judgment in public, to interact with supervisors and to relate predictably in social situations; and serious limitations in his ability to deal with the public, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed and complex job instructions, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 728-30.) She opined he could manage benefits in his own best interest, but would be absent from work more than two days monthly. (R. at 730.) Barnett based these findings on Page's limited education, physical pain and mental symptoms. (R. at 729.)

On April 2, 2019, Page saw Barnett and reported difficulty sleeping. (R. at 759.) He also stated he feared his wife would divorce him if he lost his upcoming

disability hearing. (R. at 759.) Barnett observed Page wincing in pain multiple times throughout the session, he stood to pace the room, he stayed in the room at the end of session due to sharp pain in his back and side, and he requested assistance putting on his jacket. (R. at 759.) Page's examination findings remained unchanged, except for limited insight. (R. at 760.) Barnett discussed possible inpatient psychiatric treatment due to the severity of Page's symptoms, but he did not feel it was warranted at that time. (R. at 759.) On May 22, 2019, Page reported he was grieving the loss of two young cousins. (R. at 754.) He also reported continued irritability, which he related to pain. (R. at 754.) Page stated he was easily "triggered" by "little things" and generally went off by himself to calm down. (R. at 754.) Page stated his inability to sleep, along with his anxiety and mood symptoms, impacted his overall functioning. (R. at 754.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Page argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Dr. Hines, Mullins, Barnett and Billman, and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Page contends the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations

governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[16]

Instead, an ALJ must consider and articulate how *persuasive* he finds all of the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems

---

[16] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[17] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature

---

[17] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

and extent of the medical source's relationship with the claimant and area of specialization, as well at the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2020). The ALJ found that, through the date last insured, Page had the residual functional capacity to perform light work, except he could occasionally perform postural activities, but could not climb ladders, ropes or scaffolds; he should avoid concentrated exposure to temperature extremes, vibrations and industrial hazards; he could understand, remember and carry out simple instructions and perform simple tasks with occasional interaction with others; and he would be off task less than 10 percent of the workday. (R. at 26.)

In making his residual functional capacity finding, the ALJ stated he found the opinions of Dr. Hines and Mullins "unpersuasive." (R. at 31-33.) Dr. Hines concluded Page would "unlikely" be able to walk and/or stand for a full workday; he "may be" able to sit for a partial workday with allotted occasional breaks; he would be limited to lifting or carrying items weighing less than 10 pounds; and he should refrain from excessive bending, stooping and crouching. The ALJ found Dr. Hines's opinion was "partially supported" to the extent that abnormal findings seen during the consultative examination helped to establish the existence of "severe" musculoskeletal impairments, resulting in exertional and postural limitations. (R. at 32.) However, the ALJ explained that Dr. Hines appeared to rely heavily on Page's subjective reports of pain, even though these reports conflicted with his own observations. (R. at 32.) For example, in contrast to Page's report that he could not tolerate a full workday due to pain, Dr. Hines noted he was able to sit in no

significant distress, walk and stand in the office, while rating his pain level at "8/10." (R. at 32.)

Dr. Hines reported Page had good tone and strength, bilaterally, in all muscle groups, except his bilateral lower extremities had 4/5 strength; he had 5/5 grip strength on the left and 4/5 on the right with adequate fine motor movements, dexterity and ability to grasp, bilaterally; he had intact sensation; his gait was normal, but he was slow to rise from a sitting position without assistance; he was able to bend with moderate difficulty; he had no muscle asymmetry, atrophy or involuntary movements; his straight leg raising tests were negative; and he had joint tenderness in his neck and back during range of motion, but no signs of joint instability, inflammation or deformity. The ALJ also noted Dr. Hines's assessment was generally inconsistent with Page's conservative and static treatment course. (R. at 32.)

The ALJ noted Mullins adopted her March 2017 assessment in its entirety on March 1, 2019. (R. at 32.) In support of this opinion, Mullins cited "abnormal MRI and x-rays" as a reason to restrict Page to less than sedentary work,[18] but the 2007 MRI of Page's cervical spine showed only mild abnormalities, and an MRI of his thoracic spine was unremarkable. (R. at 32, 570, 572, 731.) An EMG performed in 2005 was normal. (R. at 583.) In the 2017 decision, the ALJ found the disabling limitations opined in Mullins's March 2017 assessment were generally at odds with the conservative treatment modalities she had prescribed up to then. (R. at 32-33, 77-78.) The ALJ in this case found Mullins's assessment

---

[18] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

"unpersuasive" because it was not well-supported and was inconsistent with the evidence of record, including Mullins's own treatment notes. (R. at 33.) Mullins's office notes do not contain any musculoskeletal findings, and she did not provide musculoskeletal findings to support her assessment. The ALJ noted Mullins did not order diagnostic imaging or other diagnostic workup of Page's spine or joints. (R. at 28.) Page reported he was doing better with pain management, as Percocet and Toradol controlled his pain. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In fact, a urine drug screen in March 2019, was negative for Neurontin, cyclobenzaprine and Zoloft.

The ALJ found the opinions of the state agency physicians "persuasive" because they were well-supported and consistent with the other evidence. (R. at 31.) Drs. Kadian and Surrusco opined Page could perform a reduced range of light work. (R. at 31.) Although Page argues these opinions are outdated, the ALJ noted the objective findings revealed Page's physical condition had not worsened since the prior ALJ's 2017 decision. (R. at 35.) The ALJ noted there were no significant changes in Page's overall course of treatment or physical examination findings since 2017. (R. at 31.) The ALJ further found Page's alleged respiratory problems were not severe based on the lack of treatment for respiratory complaints and the objectively normal pulmonary examinations; therefore, the ALJ did not adopt Drs. Kadian and Surrusco's proposed environmental limitations concerning pulmonary irritants. (R. at 31.) Mullins regularly reported Page's breathing was effortless and normal; auscultation of his lungs revealed clear breath sounds, bilaterally; and his breath sounds were normal in volume.

The ALJ found Billman's opinion "somewhat persuasive" because it was partially supported by her evaluation findings, including Page's observed

difficulties with reading and writing and his anxious and depressed affect. (R. at 33-34.) The ALJ accommodated these impairments by limiting Page to work that involved simple instructions and simple tasks with only occasional interaction with others. (R. at 26.) The ALJ noted that some of Billman's assessed limitations were based on Page's subjective complaints rather than her own observations, which included Page's appropriate attire; normal grooming and hygiene; friendly conversation and cooperative attitude; good eye contact; good effort and hard work on testing and assessments; adequate concentration; no serious memory problems; normal speech; linear and goal-directed thought processes; and fair to good insight and judgment. (R. at 33-34.) Thus, the ALJ found the "marked" limitations and excessive rate of absenteeism proposed by Billman were overstated. (R. at 34.) Therefore, the ALJ found Billman's assessment "somewhat persuasive," but did not adopt it in its entirety. (R. at 34.)

The ALJ noted a similar analysis applied in the form-based mental assessment completed by Barnett. (R. at 34.) The ALJ noted Barnett relied heavily, if not entirely, on Page's self-reports in forming her assessment. (R. at 34.) In contrast to the narrative provided in her medical assessment, Barnett acknowledged in her treatment notes that Page exhibited a depressed and anxious mood with congruent affect, but she also recorded benign findings, including normal insight and judgment, normal speech, no suicidal or homicidal thoughts, full orientation and no evidence of hallucinations, delusions, or paranoia. As noted by the ALJ, Mullins repeatedly reported Page had appropriate judgment and good insight; he was fully oriented; his recent and remote memory were intact; and he had a euthymic mood and appropriate affect. (R. at 34.)

The ALJ noted he found Leizer's mental assessment "somewhat persuasive" because it was well-supported. (R. at 33.) Leizer opined Page had mild limitations

in his ability to interact with others and moderate limitations in his ability to understand, remember or apply information and to concentrate, persist or maintain pace. (R. at 33.) However, the ALJ noted Leizer's finding that Page had only mild limitations in his ability to interact with others was not consistent with the other evidence. (R. at 33.) Based on this, the ALJ found Page could understand, remember and carry out simple instructions and perform simple tasks with only occasional interaction with others. (R. at 26.)

Based on these findings, I find that substantial evidence exists to support the ALJ's consideration of the medical evidence. I also find that substantial evidence exists to support the ALJ's residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:     March 11, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE